UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO  DIVISION

---

STEVEN PACE, an individual resident of
Potter County, Texas,

TODD LITTLE, COUNTY JUDGE FOR
ELLIS COUNTY, TEXAS, in his individual          Civil Action No. 21-cv-00050
and representative capacity, and

BRIAN HARRISON, FORMER CHIEF OF
STAFF, UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,
in his individual capacity,

                    Plaintiffs,

v.

XAVIER BECERRA,
SECRETARY OF HEALTH AND HUMAN
SERVICES, in his official capacity,
U.S. Department of Health and Human
Services
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201;

DR. ROCHELLE P. WALENSKY,
DIRECTOR OF THE CENTERS FOR
DISEASE CONTROL AND PREVENTION,
in her official capacity,
Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329;

ALEJANDRO MAYORKAS, SECRETARY
OF HOMELAND SECURITY, in his official
capacity,
Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528;

                    Defendants.

---

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

INTRODUCTION

1.      This action challenges the Centers for Disease Control and Prevention's ("CDC")

February 17, 2021 Notice exempting unaccompanied non-citizen children from expulsion,

because it is in violation of the Administrative Procedure Act (APA) and should be vacated and

enjoined.  86 Fed. Reg. 9942 (Feb. 17, 2021). This "February 2021 Notice" will be referred to as

the "Exception." The Exception violates the APA because it is "arbitrary, capricious, an abuse of

discretion, and otherwise not in accordance with law" under 5 U.S.C. § 706 (2)(A).  The

Exception is arbitrary, capricious, and an abuse of discretion because it offers no rationale for

taking this final action to reverse the CDC's prior detailed, well-reasoned, scientific order from

October 2020 suspending the introduction of all aliens with high COVID-19 risk.  Under the

APA, a "reasoned explanation is needed for disregarding facts and circumstances that underlay

or were engendered by the prior policy."  *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515–16

(2009).   Indeed, the CDC explicitly stated in the Exception that it had not made a reasoned

decision about what to do, stating the agency "is in the process of reassessing the overall public

health risks at the United States' borders" and that the Exception would remain in effect

"pending the outcome of [CDC's] forthcoming public health reassessment." This is precisely the

type of arbitrary and rushed administrative action which was made illegal by the APA when it

was enacted.

2.      Further, the "Notice" is inconsistent with the CDC's earlier orders, which were

based on scientific findings, and harms Plaintiffs because it suddenly and without reason opens

our Southwest Border to illegal immigrants with COVID-19, thereby endangering the health and

welfare of the Plaintiffs and adversely affecting Plaintiff County Judge Todd Little's ability to

discharge his statutory responsibility under Texas law to protect the health and welfare of the citizens of Ellis County, Texas.

3.      On October 16, 2020, the CDC determined "that introduction of aliens, regardless of their country of origin, migrating through Canada and Mexico into the United States creates a serious danger of the introduction of COVID–19 into the United States, and the danger is so increased by the introduction of such aliens that a temporary suspension is necessary to protect the public health."  85 Fed. Reg. 65,806 (Oct. 16, 2020) (the "Order," a copy of which is attached as Exhibit A).  This determination rested in part on the fact that, as of October 2020, Mexico's COVID-19 test positivity rate was estimated by the CDC to be over 40%, and that illegal aliens moving into the U.S. are initially held in close proximity to one another in Border Patrol stations during immigration processing.  *See* 85 Fed. at 65,811 (col. a) ("Mexico's positivity rate is estimated to be around 44%").  As a result of this scientific determination, the CDC issued an order suspending the introduction of such aliens into the United States.

4.      On February 11, 2021, the CDC effectively repealed part of the Order to permit undocumented and hence illegal aliens under the age of 18 to move into the country, yet the CDC set forth no explanation for its change in policy.  86 Fed. Reg. 9942 (Feb. 17, 2021) (the "February 2021 Notice," a copy of which is attached as Exhibit B.).  Strikingly, the CDC permitted such undocumented aliens to remain in the country even though the CDC lists the COVID-19 level in Mexico as "very high,"[1] the highest risk level.

5.      As a result of this announcement, the Southwest Border has been flooded with illegal alien children, most of whom escape detention and many of whom carry COVID-19 and migrate north into the heartland of Texas, including, but not limited to, Potter and Ellis Counties,

---

[1] <https://wwwnc.cdc.gov/travel/notices/covid-4/coronavirus-mexico> (last viewed March 13, 2021).

increasing the risk of infecting individuals in those and surrounding counties.  Those who do not escape detention are held in close proximity to each other in Border Patrol stations and migrant facilities (where the risk of contracting COVID-19 is high because the overcrowded facilities cannot maintain social distancing).  This is all the more so because the Biden Administration ended the COVID-19 protocols in HHS unaccompanied alien children ("UAC") shelters instated during the Trump Administration to ensure protection for the UAC populations there before being released to sponsors throughout the United States.[2]

6.      In addition to the fact that CDC provided no explanation for its change in policy, the Exception is arbitrary because it conflicts with other actions the Administration has taken to combat COVID-19.  These include (1) reinstituting travel bans for certain aliens from Europe, Brazil, and South Africa, (2) requiring negative predeparture COVID–19 test results or documentation of recovery from COVID–19 for all airline or other aircraft passengers arriving into the United States from any foreign country, and (3) the CDC's guidance for reopening schools.

7.      While Plaintiffs do not agree with the policy, Plaintiffs are not challenging the government's policy preference for allowing UAC potentially infected with COVID-19 into the country during the pandemic while schoolhouse doors are shut to millions of American children, thousands of businesses remain shut or are operating at only partial capacity, and even vaccinated Americans are being told by the Biden Administration that they cannot resume their normal lives.  Rather, Plaintiffs challenge CDC's failure to proffer any rationale for reversing

---

[2] Priscilla Alvarez, Biden Administration tells facilities for migrant children to reopen to pre-pandemic levels, CNN, (Mar. 5, 2021) available at https://www.cnn.com/2021/03/05/politics/immigration-border-crowding-covid/index.html.

course and creating the Exception.  The government's action is arbitrary and capricious and should be set aside under the APA.

## JURISDICTION AND VENUE

8.      This case arises under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and the Public Health Services Act of 1944, 42 U.S.C. § 264, *et seq.*

9.      This Court has jurisdiction over this action under 28 U.S.C. § 1331, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

10.      Defendants are agencies of the United States and officers of the United States acting in their official capacities.  Venue in this judicial district is proper under 28 U.S.C. § 1391(e)(1)(B) since a substantial portion of the impact of Defendants' acts and omissions are felt in this judicial district, and under § 1391(e)(1)(C) since Plaintiffs reside in this judicial district.

## PARTIES

Plaintiffs

11.      Plaintiff Steven Pace is a resident of Potter County, Texas.  Moreover, Plaintiff Pace travels frequently to West Texas for his work, including to San Angelo, Abilene, and Pecos.[3]  The government's decision to allow UAC into the United States and into Texas creates undue risk of community transmission of COVID-19, threatening Plaintiff Pace's health. Because thousands of alien children are being held in, and released into, areas of Texas, including in or near Potter County, the Exception increases the risk that Plaintiff Pace contracts

---

[3] Because the Exception has resulted in such large numbers of UAC moving to the U.S., the federal government is opening a new large migrant facility in Pecos.  *See* Julia Ainsley and Alicia Victoria Lozano, U.S. to open overflow facility for unaccompanied migrant children, NBC News (Mar. 20, 2021), available at https://www.nbcnews.com/news/us-news/u-s-open-overflow-facility-unaccompanied-migrant-children-n1261681.

COVID-19.  Plaintiff Pace is 56 years old.  The CDC has explained that the "risk for severe illness with COVID-19 increases with age," and "people in their 50s are at higher risk for severe illness than people in their 40s."[4]

12.     Plaintiff Todd Little is Ellis County Judge.  Plaintiff Little brings this action in his individual and representative capacities.  Because thousands of alien children are being held in, and released into, areas of Texas, including in or near Ellis County, the Exception unduly increases the risk that Plaintiff Little contracts COVID-19.  Judge Little is 51 years old.  The CDC has explained that the "risk for severe illness with COVID-19 increases with age," and "people in their 50s are at higher risk for severe illness than people in their 40s."[5]

13.     Additionally, as Ellis County Judge, Plaintiff Little is charged by Texas law with administering and supervising Ellis County's health and human services, to include the County's indigent health care services.  Plaintiff Little is the County's director of emergency management and manages the protocols for combating COVID-19 spread in the community.  The government's decision to allow UAC into the United States and into Texas unduly increases the risk of community transmission of COVID-19 in Ellis County.  It also risks unduly straining Ellis County's healthcare system and limited hospital capacity.

14.     Plaintiff Brian Harrison is the former Chief of Staff of the United States Department of Health and Human Services, which is a cabinet-level department of the U.S. government and the parent agency of the CDC with oversight responsibilities during the period that CDC issued its Order effectively closing our Southwest Border to illegal immigrants. Plaintiff Harrison is resident of Ellis County, Texas.  Because thousands of alien children are

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html
[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

being held in, and released into, areas of Texas, including in or near Ellis County, the Exception

unduly increases the risk that Plaintiff Harrison contracts COVID-19.

Defendants

15.     Defendant Alejandro Mayorkas is Secretary of the Department of Homeland

Security, which is a cabinet-level department of the U.S. government.  He is sued in his official

capacity.  In that capacity, Defendant Mayorkas is responsible for the administration of the

immigration laws pursuant to 8 U.S.C. § 1103.  The Department of Homeland Security ("DHS")

is responsible for aiding in the enforcement of the Order.  *See* 85 FR 65,812.  DHS' components

include U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs

Enforcement ("ICE").

16.     Defendant Xavier Becerra is the Secretary of the Department of Health and

Human Services ("HHS"), which is a cabinet-level department of the U.S. government.  He is

sued in his official capacity.  In that capacity, Defendant Becerra is responsible for the oversight

of both the CDC and the Office of Refugee Resettlement ("ORR"), which are components of

HHS.  The latter is responsible for UAC.

17.     Defendant Dr. Rochelle P. Walensky, M.D., is the Director of the CDC.

Defendant Walensky is sued in her official capacity.  Under 42 C.F.R. § 71.40, the Director may

prohibit, in whole or in part, the introduction into the United States of persons from designated

foreign countries (or one or more political subdivisions or regions thereof) or places, for such

period of time that the Director deems necessary to avert the serious danger of the introduction of

a quarantinable communicable disease, by issuing an order in which the Director makes certain

determinations.

BACKGROUND

The Government's Use of Powers to Limit the Spread of COVID-19 from Foreign Countries

18.     Congress enacted 42 U.S.C. § 265 to empower the federal government to protect Americans from communicable diseases from abroad.  The statute allows the government "to prohibit, in whole or in part, the introduction of persons and property from such countries or places as [the Surgeon General][6] shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose."

19.     In the early days of the COVID-19 pandemic, CDC issued a regulation and order to limit the introduction of certain aliens from certain countries with COVID-19 outbreaks.   85 Fed. Reg. 17,060 (Mar. 26, 2020); *see also* 42 C.F.R. § 71.40 (implementing 42 U.S.C. § 265 and specifying the conditions for issuing an order).

20.     CDC extended the March 2020 order in April and May 2020.  85 Fed. Reg. 22,424 (Apr. 22, 2020); 85 Fed. Reg. 31,503 (May 26, 2020).  CDC revised and extended the suspension order again in October 2020.  85 Fed. Reg. 65,806 (the "Order").

21.     The Order builds on the well-reasoned, detailed determinations made in the earlier orders.  The Order contains a well-reasoned, lengthy, detailed factual basis section that appears to be the product of a rational, scientific deliberative process.  *See id.* at 65,809-65,812.

---

[6] The statute assigns this authority to the Surgeon General of the Public Health Service. Nevertheless, Reorganization Plan No. 3 of 1966, among other things, transferred all statutory powers and functions of the Surgeon General to other officers of the Public Health Service, and of all agencies of or in the Public Health Service to the Secretary of Health, Education, and Welfare (now the Secretary of Health and Human Services), 31 Fed. Reg. 885580 Stat. 1610 (June 25, 1966), *see also* Public Law 96– 88, § 509(b), 93 Stat. 695 (Oct. 17, 1979) (codified at 20 U.S.C. § 3508(b)). As a result, all authorities previously vested in the Surgeon General and his or her inferior officers are to be read as residing in the Secretary of HHS. In issuing 42 C.F.R. § 71.40, the Secretary of HHS delegated to the CDC director the authority to issue orders under that regulation.  *See* 42 C.F.R. § 71.40.

22.     Among other things, the Order discusses the close quarters of congregate settings where aliens moving into the United States reside during immigration processing.  The Order also discusses COVID-19 case and fatality statistics in neighboring countries.

23.     Specifically, the Order determined that there is a serious danger of the introduction of COVID–19 into the ports of entry ("POEs") and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the United States land and coastal borders with Canada and Mexico.  85 FR 65,807.

24.     The Order found that those persons are subject to immigration processing in the POEs and Border Patrol stations. Many of those persons (typically aliens who lack valid travel documents and are therefore inadmissible) are held in the common areas of the facilities, in close proximity to one another, for hours or days, as they undergo immigration processing. The common areas of such facilities were not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID–19.  *Id.*

25.     Therefore, according to the Order, the introduction into congregate settings in land and coastal POEs and Border Patrol stations of persons from Canada or Mexico increases the already serious danger to the public health to the point of requiring a temporary suspension of the right of introduction of such persons into the United States.  *Id.*

26.     The Order found that the public health risks of inaction include transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior; and the increased strain that further transmission and spread of COVID–19 would

put on the United States healthcare system and supply chain during the current public health emergency. *Id.*

27.     The Order found those risks particularly troubling because POEs and Border Patrol stations were not designed and are not equipped to deliver medical care to numerous persons exposed to or infected with a quarantinable communicable disease. *Id.*

28.     The Order also found that POEs and Border Patrol stations are not capable of providing the level of medical care that would be necessary in the cases of serious COVID–19 infection that occur with acute presentations of illness to local or regional healthcare providers for treatment. *Id.*

29.     According to the Order, outbreaks of COVID–19 in POEs or Border Patrol stations would lead to transfers of such persons to local or regional health care providers, which would exhaust the local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare workers to COVID–19. *Id.*

30.     The continuing availability of healthcare resources to the domestic population is a critical component of the federal government's overall public health response to COVID–19. *Id.*

The Dangers Described in the Order Are Even Greater Today

31.     Despite the recent authorization of COVID-19 vaccines, the dangers described in the Order are, if anything, even greater today.  As of March 21, 2021, the number of daily confirmed COVID-19 cases in the U.S. has been higher nearly every day for the last two months than it was when the Order was issued.[7]  Moreover, new variants are entering the U.S. from abroad, underscoring the need to restrict unregulated travel to the United States.

---

[7] https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.

32.     In addition, a recent migration surge has caused more UAC to be crammed in close proximity to one another in Border Patrol facilities for longer periods of time.  Thus, the danger of superspreader events in Border Patrol facilities is far greater now than when the Order was issued.

33.     A March 9, 2021 CNN article explained:

> The number of unaccompanied migrant children in US Border Patrol facilities intended for adults climbed on Tuesday, surpassing record highs from the previous day, according to new figures reviewed by CNN.  More than 3,400 unaccompanied migrant children were in Customs and Border Protection custody, according to the data dated Tuesday. . . . The numbers are overwhelming.  To compare, at the peak of the 2019 border crisis -- when there were overcrowded facilities and children sleeping on the ground -- there were around 2,600 unaccompanied children in Border Patrol custody, a former CBP official told CNN.[8]

34.     Similarly, a March 11, 2021 Reuters report states that "[m]ore than 3,600 migrant children were being held in U.S. border facilities as of Thursday morning."[9]  This was "more than four times the number in late February."[10]

35.     Reuters added that the "number of mostly Central American unaccompanied children arriving at the U.S.-Mexico border has risen rapidly in recent weeks, with more children stuck in border patrol stations while they await transfers to increasingly crowded federal shelters and eventual release to parents or other sponsors."[11]

36.     Reuters explains that the "border stations were built to house adult men for short periods and could pose a COVID-19 health risk to children and staff if they grow overcrowded."

---

[8] Priscilla Alvarez, Record number of migrant children held in Border Patrol custody as cases climb overnight, CNN, (Mar. 9, 2021), available at
https://www.cnn.com/2021/03/09/politics/immigration-border-patrol-children/index.html
[9] Number of Migrant Children in U.S. Border Facilities Soars Amid Growing Crisis, Reuters, (Mar. 11, 2021), available at https://www.usnews.com/news/top-news/articles/2021-03-11/number-of-migrant-children-in-us-border-facilities-soars-amid-growing-crisis.
[10] *Id.*
[11] *Id.*

37.     In other words, in October 2020 CDC found that COVID–19 outbreaks in POEs or Border Patrol stations would exhaust local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare workers to COVID–19.  The number of children in POEs or Border Patrol stations has since exploded, yet CDC is exempting such children from the Order without explanation.

38.     The number of migrant children held in Border Patrol custody has since increased to 4,000 as of March 16, including at least 3,000 in custody longer than the 72-hour limit set by a court order, according to a U.S. official.[12]

39.     A March 22, 2021 article in Axios contains pictures that Congressman Henry Cuellar took at a Texas migrant facility.  The pictures show what Axios calls a "crowded" facility with UAC in close quarters and unable to maintain social distancing.  Axios explains that although one of the "pods" at the facility has a 260-person occupancy, it held more than 400 unaccompanied male minors.[13]

40.     These types can (and in some cases already have) turned into so-called "superspreader" events.

41.     On March 18, the Associated Press reported that, at a recently opened overflow migrant camp, "[*m]ore than 10% of the camp's population* has tested positive for COVID-19 and at least one child had to be hospitalized" (emphasis added).[14]

---

[12] Child border crossings surging, straining U.S. facilities, Associated Press (Mar. 16, 2021), available at https://www.pbs.org/newshour/politics/child-border-crossings-surging-straining-u-s-facilities.

[13] Stef W. Knight, Scoop: Inside a crowded border patro tent in Donna, Texas, Axios, (Mar. 22, 2021), available at https://www.axios.com/photos-overcrowded-border-patrol-migrant-tents-0525a96b-0dc8-473f-b59c-38b0b3e52760.html

[14] Nomaan Merchanrt and Adriana Gomez Licon, Emergency sites for migrant children raising safety concerns, ABC News, (Mar. 18, 2021), available at https://abcnews.go.com/Health/wireStory/emergency-sites-migrant-children-raising-safety-concerns-76547930.

42.     UAC are nearly uniformly not vaccinated.  The FDA has only approved the Pfizer-BioNTech COVID-19 vaccine for individuals age 16 or older.  Both the Moderna and Johnson & Johnson COVID-19 vaccines are only approved for individuals 18 years of age or older.  Therefore, even if the U.S. had adequate vaccine doses, it could not administer them to UAC.

<u>CDC's Arbitrary Exception to the Order</u>

43.     In February 2021, CDC announced that UAC would be exempt from the Order. CDC did this even though it acknowledges the Order is enforceable with respect to UAC, because the D.C. Circuit stayed a district court decision concerning the Order's validity.  86 Fed. Reg. 9942.

44.     The February 2021 Notice has also acted as open invitation encouraging illegal immigration in general across our Southwest Border, which has led in turn to record numbers crossing the border and a significant and widely recognized humanitarian crisis.

45.     The full substantive portion of the barebones February 2021 Notice is as follows:

> The current COVID–19 pandemic continues to be a highly dynamic public health emergency. CDC is in the process of reassessing the overall public health risk at the United States' borders and its "Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists" based on the most current information regarding the COVID–19 pandemic as well as the situation at the Nation's borders. Although the D.C. Circuit's stay pending appeal permits the CDC to enforce its order and immediately expel unaccompanied noncitizen children, CDC has exercised its discretion to temporarily except from expulsion unaccompanied noncitizen children encountered in the United States pending the outcome of its forthcoming public health reassessment of the Order. This temporary exception went into effect on or about Saturday, January 30, 2021, and will remain in effect until CDC has completed its public health assessment and published any notice or modified Order. All other terms of the

Order, including its application to adults, remain in place until such
time as any modified Order is issued.[15]

46.     The February 2021 Notice provides no public-health rationale (or other rationale)

for why circumstances have changed since the Order.

47.     In fact, CDC has not determined the Order is no longer necessary.  It merely

promises a new assessment of "the overall public health risk at the United States' borders" at an

unspecified future date.  *Id.*  This is a clear admission that the CDC has no new data to support

the Exception.

48.     But under the APA, a "reasoned explanation is needed for disregarding facts and

circumstances that underlay or were engendered by the prior policy."  *FCC v. Fox TV Stations,*

*Inc.*, 556 U.S. 502, 515–16 (2009).  *See also Dep't of Homeland Security v. Regents of Univ. of*

*Cal.*, 140 S. Ct. 1891, 1916 (2020).  CDC gave no such explanation here.

49.     If CDC has not yet determined the overall public health risk has changed, it

cannot disregard the Order.

<u>CDC's Arbitrary February 2021 Notice Conflicts with the Administration's COVID-19
Response</u>

50.     The February 2021 Notice is particularly arbitrary because, not only does it lack

explanation, but it conflicts with other Administration actions in response to the COVID-19

outbreak.

51.     *First*, CDC's opening the Southwest Border to thousands of potentially infected

individuals is particularly arbitrary because in January President Biden signed a proclamation

maintaining COVID-19 travel restrictions on most of Europe and Brazil, after former President

---

[15] 86 FR 9,942 (Feb. 17, 2021).

Trump moved to roll these back just days before he left office.[16]  The proclamation also imposed travel restrictions on certain aliens traveling from South Africa.[17]

52.     However, the risk of undetected COVID-19 cases is greater from individuals coming across the Southwest Border than from Europe, Brazil, or South Africa:

- Unlike in the case of undetected aliens crossing the southwest border, the U.S. can insist that those flying from Europe, Brazil, or South Africa be tested or vaccinated before entering the U.S.[18]

- Those flying to the U.S. from Europe, Brazil, or South Africa will not be placed in POE or border facilities upon arrival, unlike UAC.  The Order found that placing large numbers of individuals in close proximity to one another for hours or days at congregate facilities increased the already serious danger to the public health of the U.S.[19]

53.     *Second*, the Exception and its implementation conflict with a CDC order requiring negative predeparture COVID–19 test results or documentation of recovery from COVID–19 for all airline or other aircraft passengers arriving into the United States from any foreign country.  86 Fed. Reg. 7387 (Jan. 25, 2021).

54.     CDC requires all individuals who fly into the U.S., including U.S. citizens, to test negative for COVID-19 or show proof of recovery from COVID-19.  But CDC is permitting UAC who illegally come into the country to stay, even if they have not tested negative for

---

[16] Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease 2019, 86 FR 7467 (Jan. 28, 2021); *see also* Lori Aratani, Biden Reimposes Travel Ban on European Countries, Adds South Africa, Washington Post (Jan. 25, 2021), available at https://www.msn.com/en-us/news/us/biden-to-reimpose-travel-ban-on-european-countries-add-south-africa-in-effort-to-contain-coronavirus/ar-BB1d50Py.
[17] *Id.*
[18] *See* 86 FR 7387.
[19] 85 FR at 65,810.

COVID-19 prior to arrival or prove they have recovered from COVID-19.  DHS Secretary

Mayorkas told Congress on March 17, 2021 that not all illegal aliens who came to the U.S. were

tested for COVID-19 before they were released into the interior.[20]

55.     Furthermore, CDC guidelines say those flying into the U.S. should stay home and

self-quarantine for seven days after flying into the U.S.[21]  But the Exception causes the federal

government to shelter UAC in overcrowded facilities—**the opposite of self-quarantine.**

56.      Therefore, according to the CDC's own logic, the Exception is increasing the risk

of COVID-19 transmission.

57.     *Third,* the Exception conflicts with the Administration's school reopening

guidance.

58.     The Exception allows unaccompanied alien children to be housed, clothed, fed,

and educated in congregate settings while millions of Americans lack access to in-person

education.

59.     CDC guidance states that "higher risk" and "highest risk" for schools occurs when

"students and teachers engage entirely in in-person learning, activities, and events with" mixing

of students and/or teachers throughout the day.[22]

60.     But such in-person learning and mixing is unavoidable when scores of UAC are

both housed and educated at HHS congregate facilities.  This situation can easily be avoided if

---

[20] Stephen Dinan, 'Mistakes made': DHS chief admits release of untested migrants into communities, Washington Times (Mar. 17, 2021), available at https://www.washingtontimes.com/news/2021/mar/17/alejandro-mayorkas-dhs-chief-admits-mistakes-made-/.
[21] https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html ("Get tested 3-5 days after travel **AND** stay home and self-quarantine for 7 days after travel.  Even if you test negative, stay home and self-quarantine for the full 7 days.") (emphasis in original).
[22] Operating schools during COVID-19: CDC's Considerations, available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html

the federal government returned these UAC to their home countries and their families, as it had been doing for many months prior to the Exception.

<u>The Individual Plaintiff's Injuries from the Arbitrary Exception</u>

61.     The Order explicitly states that absent the Order, the "public health risks . . . include transmission and spread of COVID–19 to CBP personnel, U.S. citizens, [and] lawful permanent residents."  85 Fed. Reg. at 65,807.

62.     The Order adds that, absent the Order, there risks being "increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency."  *Id.*

63.     Thus, CDC has publicly stated that not enforcing the Order in full increases the risk of COVID-19 transmission to Plaintiffs.  CDC has not since provided a public-health rationale for why that is no longer the case.

64.     As the Order explains, those UAC who are apprehended are placed in close proximity to one another at Border Patrol stations for hours or days at as they undergo immigration processing.  The Order found that the common areas of such facilities were not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID–19.  85 Fed. Reg. 65,808.  Thus, the risk of contracting COVID-19 in such facilities is high.

65.     Compounding the problem, apprehended UAC are transferred from these facilities to UAC shelters run by HHS.  News reports indicate many of these shelters are located throughout Texas.[23]

---

[23] https://revealnews.org/article/heres-a-map-of-shelters-where-immigrant-children-have-been-housed/

66.     Because the number of UAC crossing the Southwest border recently is so high, these shelters had to fill to maximum capacity and abandon the COVID-19 protocols enacted during the Trump Administration that limited the number of children they could shelter.[24]

67.     As of March 15, 2021, the federal government planned to imminently use a convention center in downtown Dallas to shelter 3,000 illegal alien teenagers because existing facilities are overcrowded and cannot shelter more aliens.[25]

68.     After being housed in these shelters for a period of time, unaccompanied UAC are then sent throughout the interior of the U.S. (often via public transit) to "sponsors," thereby transmitting COVID-19 to all corners of the population. 8 U.S.C. 1232(c)(3).

69.     Absent the Exception, these UAC would be quickly removed from the U.S. after apprehension, lessening the likelihood they could transmit COVID-19 to Plaintiffs.

70.     In addition, most illegal immigrants, including those under 18, are not apprehended by federal officials, but instead migrate north to various counties and their environs, including Potter and Ellis Counties.  The Exception acted as open invitation encouraging illegal immigration in general across our Southwest Border, which has led in turn to record numbers of such children whom are not apprehended while crossing the border.

71.     Many of these illegal immigrants have COVID-19, thereby placing the Texas population, including plaintiffs, at further risk of contagion.[26]

---

[24] Stef W. Knight, CDC lets child migrant shelters fill to 100% despite COVID concern, Axios (Mar. 5, 2021), available at https://www.axios.com/cdc-child-migrant-shelter-full-capacity-coronavirus-41d1ae80-1ecf-4815-a755-7b01fac5850b.html
[25] Immigrant teens to be housed at Dallas convention center, Associated Press (Mar. 15, 2021), available at https://apnews.com/article/dallas-health-coronavirus-pandemic-immigration-border-patrols-fa567f671faa0e9eb33e37f30746f1b6.
[26] See, e.g., https://www.washingtonpost.com/politics/senators-border-minors-press-access/2021/03/20/c4ce50ce-89c2-11eb-8a67-f314e5fcf88d_story.html (noting that just a single unaccompanied alien children facility had 35 detected cases of COVID-19).

72.     Absent the Exception, far fewer potentially infected aliens would cross the Southwest Border.  Therefore, absent the Exception, the risk of Plaintiffs contracting COVID-19, or the risk of undue burden on local healthcare systems, would be greatly decreased.

73.     Absent the Exception, there would be no need to house thousands of potentially infected individuals in the heart of a major metropolitan area near many individuals who will travel to Plaintiffs' counties.

74.     This 3,000-person shelter, at a time when the CDC recommends against far smaller gatherings, poses a substantial risk of infecting nearby Texans, including Plaintiffs, with COVID-19.  This is all the more so because those housed at the convention center will soon be transported to other places in Texas and the U.S.

<u>The Injuries to Judge Little in His Representative Capacity from the Arbitrary Exception</u>

75.     Under the Order and the CDC's prior suspension orders, Ellis County's scarce health care resources were directed to meeting the needs of its legal residents.  Even with this focus on its residents, thousands of COVID-19 cases have been reported in Ellis County, with hundreds of deaths.

76.     Ellis County has limited hospital capacity.  Its county hospitals have 235 beds and 18 intensive care beds available.  As of March 22, 2021, 152 of its 235 beds are occupied, and 12 of Ellis County's 18 intensive care beds are being utilized.[27]

77.     The CDC's recent decision to allow unaccompanied alien children into the United States presents a significant risk of immediate and irreparable harm to Ellis County residents. These alien children, once moving into the United States at the Southwest Border, frequently

---

[27] See https://www.co.ellis.tx.us/992/COVID-19-Dashboard (last visited Mar. 22, 2021).

migrate into the interior of the United States and ultimately into places like Ellis County.  Many

of these aliens are infected with COVID-19 and have not had access to medical care or a

COVID-19 vaccine.  Moreover, many have been in close proximity to large numbers of other

aliens at overcrowded Border Patrol facilities or Office of Refugee Resettlement facilities that

have or may soon have significant COVID-19 outbreaks.  In this regard, these aliens present

health risks separate and unique from legal U.S. residents.

78.     A slight increase in cases has the potential of straining Ellis County's County

health resources, thereby causing immediate and irreparable harm to the health care system of

Ellis County and to its residents.  The persons most adversely affected by the CDC's new policy

of allowing illegal immigrants into the United States in the midst of the ongoing pandemic would

be indigent legal residents of Ellis County, Texas—the most economically vulnerable among

us—who cannot afford to receive care at a private hospital or to travel to public hospitals outside

Ellis County.  At the same time, the risk of community spread puts the health of all Ellis County

residents in jeopardy.

79.     The CDC offered no rationale for partially undoing the Order.  The CDC also

offered no guidance to County Officials like Judge Ellis on how to mitigate the risk of COVID-

19 from the illegal aliens that its new policy allows into the United States and Ellis County.

### CDC's Arbitrary Exception Is Subject to Judicial Review

80.     The Exception satisfies the standard for judicial review.

81.     First, it is action by which rights or obligations have been determined, or from

which legal consequences flow.  The Exception affects which aliens who illegally move into the

U.S. can remain in the U.S.

82.     Moreover, the Exception marks the consummation of the agency's decision making process to create an exception to the Order.  Although couched as a "temporary" exception, the February 2021 Notice states the Exception went into effect on January 30, 2021 and the Notice was signed on February 11, 2021 (note that CDC affected a significant change in policy yet did not even tell the country for two weeks).  Thus, the Exception has been in effect for over a month with no end in sight.  CDC merely characterized it as "temporary" to avoid judicial review of what is in fact final agency action.

83.     The Exception marks a significant, indefinite change in policy that has had widespread effects on CBP, the U.S. public-health system, the American public, and UAC (including increasing the public-health risks to UAC who were in the U.S. prior to the implementation of the Exception).

84.     Therefore, the Exception is subject to judicial review under 5 U.S.C. § 706.

<u>COUNT I</u>
Violation of 5 U.S.C. § 706(2)(A) and (D)
Actions Arbitrary, Capricious, and Contrary to Law

85.     Plaintiffs incorporate all of the foregoing allegations as if fully set forth herein.

86.     The Order created an affirmative program for suspending the introduction of certain aliens into the United States.  *Cf. Regents of Univ. Cal.*, 140 S. Ct. at 1906 (noting that "the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief").  The Exception "is an 'action [that] provides a focus for judicial review.'"  *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)).

87.     The Order created reliance interests, and the Plaintiffs reasonably relied on the Order, which served to protect their health and wellbeing.  For example, Ellis County's

healthcare system relied on the fact that the federal government would suspend the introduction of certain aliens when required in the interest of public health, and would only cease such suspension when there was an adequate public-health rationale for doing so.

88.     Defendants' actions in the February 2021 Notice are arbitrary, capricious, and contrary to law.  Under the APA, a "reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515–16 (2009).  Defendants failed to provide any rationale (let alone an adequate one) for the Exception, in violation of the APA, *Fox*, and *Regents*.  In partially rescinding the Order, Defendants failed to consider any relevant factors at all, including those set forth in 42 U.S.C. § 265, 42 C.F.R. § 71.40, and the Order.

89.     The Exception has injured Plaintiffs by increasing the risk that they will contract COVID-19 and increasing the risk of undue strain on the Potter and Ellis County healthcare systems.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray this Court to:

A.     Declare that the February 2021 Notice is unlawful;

B.     Enter an order vacating the February Notice and enjoining Defendants from implementing that Notice;

C.     Enter an injunction requiring Defendants to enforce the October 2020 Order;

D.     Award Plaintiffs' counsel reasonable attorney's fees under the Equal Access to Justice Act, and any other applicable laws; and

E.     Grant further such relief as this Court deems just, equitable, and appropriate.

Respectfully submitted,

**BRIAN FOLEY**
BRIAN FOLEY LAW PLLC
State Bar No. 24073297
412 W. Phillips St. Ste #125
Conroe, Texas 77301
Phone: (936) 596-0407
Fax: (833) 233-4204
foley@brianfoleylaw.com