IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

| | |
|---|---|
| STEVEN PACE, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2:21-CV-50-Z |
| XAVIER BECERRA, et al., | |
| Defendants. | |

## **<u>DEFENDANTS' MOTION TO DISMISS</u>**

PRERAK SHAH
Acting United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

# Table of Contents

I.     Introduction ......................................................................................................... 1

II.    Background.......................................................................................................... 2

       A.     Statutory and regulatory background ..................................................... 2

       B.     Plaintiffs file this suit challenging the CDC's February 2021 notice
              and unsuccessfully seek a temporary restraining order................................ 6

III.   Legal Standard.................................................................................................... 7

IV.    Argument and Authorities .................................................................................. 8

       A.     Plaintiffs lack standing ......................................................................... 8

       B.     There is no final agency action to review .................................................. 15

       C.     The decision to partially suspend enforcement of a section 265 order
              is committed to agency discretion............................................................... 21

V.     Conclusion......................................................................................................... 25

## Table of Authorities

### Cases

*Am. Airlines, Inc. v. Herman*,
  176 F.3d 283 (5th Cir. 1999) ................................................................................ 19

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ............................................................................... 12

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................... 16, 18

*Bouchard Transp. Co. v. Dep't of Homeland Sec.*,
  384 F. Supp. 3d 775 (S.D. Tex. 2019) .................................................................. 17

*Croft v. Governor of Tex.*,
  562 F.3d 735 (5th Cir. 2009) .................................................................................. 8

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
  490 F. Supp. 3d 1048 (N.D. Tex. Sept. 28, 2020) .................................... 17–18, 19

*Dep't of Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999) ............................................................................................. 16

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ......................................................................................... 20

*Ellison v. Connor*,
  153 F.3d 247 (5th Cir. 1998) ................................................................................ 25

*El Paso Cty. v. Trump*,
  982 F.3d 332 (5th Cir. 2020) ................................................................................ 12

*Food & Water Watch v. EPA*,
  5 F. Supp. 3d 62 (D.D.C. 2013) ........................................................................... 18

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................................ 16–17

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ............................................................................................... 8

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ...................................................................................... 21, 24

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ........................................................................... 15

*Home Builders Ass'n of Miss., Inc. v. City of Madison*,
    143 F.3d 1006 (5th Cir. 1998) ............................................................... 7

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905) ............................................................................. 23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 15

*Marshall v. United States*,
    414 U.S. 417 (1974) ........................................................................... 23

*P.J.E.S. v. Wolf*,
    --- F. Supp. 3d ---, 2020 WL 6770508 (D.D.C. Nov. 18, 2020) ...................... 5, 19

*Ponce-Osorio v. Johnson*,
    824 F.3d 502 (5th Cir. 2016) .............................................................. 16

*Promiseland Metro, Inc. v. U.S. Army Corps of Eng'rs*,
    No. 4:15-CV-817-A, 2016 WL 543209 (N.D. Tex. Feb. 9, 2016) ...................... 25

*Qorane v. Barr*,
    919 F.3d 904 (5th Cir. 2019) .............................................................. 21

*Qureshi v. Holder*,
    663 F.3d 778 (5th Cir. 2011) .......................................................... 16, 17

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ........................................................ 7–8, 8

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ...................................................................... 23

*St. Tammany Parish ex rel. Davis v. FEMA*,
    556 F.3d 307 (5th Cir. 2009) .............................................................. 21

*Suntex Dairy v. Block*,
    666 F.2d 158 (5th Cir. 1982) .............................................................. 25

*Texas v. Rettig*,
    987 F.3d 518 (5th Cir. 2021) .......................................................... 16, 19

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) ................................................................ 13, 14

*United States v. Cole*,
    No. 1:09-CR-118, 2021 WL 1207556 (N.D. Ind. Mar. 31, 2021) ........................ 13

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................. 8

*Webster v. Doe*,
    486 U.S. 592 (1988) ................................................................................ 21

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ........................................................................... 17, 19

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ................................................................... 5

## Statutes, Regulations, and Other Authorities

5 U.S.C. § 701(a)(2) ........................................................................................ 21

5 U.S.C. § 702 ......................................................................................... 15, 21

5 U.S.C. § 704 ............................................................................................. 16

8 U.S.C. § 1232 ............................................................................................ 1

8 U.S.C. § 1232(a)(1) ..................................................................................... 4

8 U.S.C. § 1232(a)(2) ..................................................................................... 5

8 U.S.C. § 1232(a)(5)(D) ................................................................................. 5

8 U.S.C. § 1232(c)(2) ..................................................................................... 5

28 U.S.C. § 1291 ......................................................................................... 18

31 Fed. Reg. 8855 (June 25, 1966) ..................................................................... 2

42 C.F.R. § 71.40 ..................................................................................... 3, 24

42 C.F.R. § 71.40(a) ..................................................................................... 24

42 U.S.C. § 265 ................................................................................... 2, 22, 24

46 Tex. Reg. 1567 (Mar. 2, 2021) ...................................................................... 11

85 Fed. Reg. 16,559 (Mar. 24, 2020) ................................................................... 3

85 Fed. Reg. 17,060 (Mar. 26, 2020) ......................................................... 1–2, 2

85 Fed. Reg. 56,424 (Sept. 11, 2020) .................................................................. 3

85 Fed. Reg. 65,806 (Oct. 16, 2020) .................................................................... 3

86 Fed. Reg. 9942 (Feb. 17, 2021) ................................................................. 4, 18

Governor of the State of Tex., Executive Order No. GA-36 (May 18, 2021),
    *available at* https://gov.texas.gov/uploads/files/press/EO-GA-
    36_prohibition_on_mandating_face_coverings_response_to_
    COVID-19_disaster_IMAGE_05-18-2021.pdf...................................... 11

## I.        Introduction

A federal statute authorizes the Centers for Disease Control and Prevention (CDC) to suspend the introduction of certain persons or property into the United States if the CDC determines that their introduction would increase the danger of the spread of a communicable disease.  Acting pursuant to this authority in response to the COVID-19 pandemic, the CDC in March 2020 and again in October 2020 suspended the introduction of certain noncitizens at the country's borders, while also allowing for exceptions.  Most recently, in February 2021, the CDC announced that it was temporarily suspending the expulsion of one subcategory of such noncitizens—unaccompanied noncitizen children— pending further review and reappraisal of the operative October CDC order, given the changing nature of the COVID-19 pandemic.  As a result, unaccompanied noncitizen children who otherwise would have been expelled under the October 2020 order are now once again processed under the immigration laws, including 8 U.S.C. § 1232, as they were prior to March 2020.

Plaintiffs disagree with this state of affairs and ask this Court to vacate the CDC's February 2021 notice.  But for several reasons, Plaintiffs cannot establish jurisdiction for their suit.  Because their alleged injuries—increased risk of getting COVID-19 and increased chance of COVID-19 cases overwhelming local hospitals—rest on a speculative chain of events and they allege no facts supporting that speculative chain or showing any actual, concrete injury to them caused by the government's action, Plaintiffs lack standing.  In addition, Plaintiffs rely on the Administrative Procedure Act but cannot show any "final agency action" as is necessary for review under that statute; to the

contrary, the CDC's February 2021 notice was expressly issued as a temporary measure pending further review of the October 2020 order.  Finally, even if Plaintiffs had standing and there were some final agency action, there are no statutory or regulatory standards governing the CDC's exercise of discretion in deciding to temporarily suspend the expulsion of unaccompanied noncitizen children encountered in the United States; thus, the matter is committed to agency discretion as a matter of law such that judicial review is unavailable.  As explained in more detail below, the Court should dismiss this action for lack of jurisdiction.

## II.      Background

### A.      Statutory and regulatory background

As previously recounted by this Court, "[t]his suit challenges administrative action taken by CDC regarding the entry of aliens from Canada and Mexico into the United States."  (Doc. 12 at 1.)  Specifically, 42 U.S.C. § 265 authorizes the CDC[1] to suspend the introduction into the United States of "such persons and property" determined by the CDC to increase the danger of the spread of communicable disease.  In light of the COVID-19 pandemic, the CDC exercised its section 265 authority in March 2020 by issuing an order temporarily suspending the introduction into the country of certain noncitizens traveling from Canada and Mexico, with certain exceptions.  *See* 85 Fed.

---

[1] The statute refers to the Surgeon General, but authority was later transferred to the Secretary of Health and Human Services, who in turn has delegated this authority to the CDC Director.  *See* 31 Fed. Reg. 8855 (June 25, 1966).  This motion will generally refer to the CDC when referring to actions of the CDC Director taken pursuant to section 265 authority.

Reg. 17,060 (Mar. 26, 2020).[2]  The suspension implemented by the March 2020 order

authorized the expulsion of covered noncitizens to the country from which they entered

the United States, their country of origin, or another location as quickly as practicable.

*Id.* at 17,067.  The order applied to any noncitizens, regardless of their country of origin,

"who would otherwise be introduced into a congregate setting" at or near the border—

typically those individuals "who lack valid travel documents."  *Id.* at 17,061.  Such

individuals, the order explained, may spend hours or days in congregate settings while

undergoing immigration processing, but the Ports of Entry and Border Patrol stations are

"not designed for, and are not equipped to, quarantine, isolate, or enable social

distancing."  *Id.*  The March 2020 order was subsequently extended multiple times.

    In October 2020, the CDC issued a new section 265 order to replace the March

2020 order (as amended and extended).  *See* 85 Fed. Reg. 65,806 (Oct. 16, 2020).  The

October 2020 order explained that it was "substantially the same as the amended and

extended March 20, 2020 Order" and was necessary to continue to protect against the

introduction of COVID-19 into the Ports of Entry and Border Patrol stations "at or near

the United States borders with Canada and Mexico."  *Id.* at 65,808.  The order also noted

the "dynamic nature" of the COVID-19 pandemic and explained that the CDC "retain[ed]

the authority to extend, modify, or terminate the Order, or implementation of this Order,

at any time as needed to protect public health."  *Id.* at 65,809 n.9, 65,812.

---

[2] The CDC also issued an interim final rule in March 2020 to add an implementing regulation for section
265 (at 42 C.F.R. § 71.40), with the final rule then issued in September 2020.  *See* 85 Fed. Reg. 16,559
(Mar. 24, 2020); 85 Fed. Reg. 56,424 (Sept. 11, 2020).

On February 11, 2021, the CDC gave notice that it had decided to temporarily except one subcategory of noncitizens covered by the October 2020 order—unaccompanied noncitizen children encountered in the United States—from expulsion from the country pending a forthcoming reassessment of the October 2020 order. *See* 86 Fed. Reg. 9942 (Feb. 17, 2021). The CDC explained in the February 2021 notice that the COVID-19 pandemic continues to be a highly dynamic public-health emergency, and that the CDC is in the process of reassessing the October 2020 order based on the most current information regarding the pandemic and the situation at the country's borders. *Id.*

The practical effect of the February 2021 notice is that unaccompanied noncitizen children encountered in the United States are no longer subject to expulsion from the country under the October 2020 order and are, instead, processed under the immigration provisions in Title 8 of the U.S. Code. Specifically, such children are processed under the provisions of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), which, among other things, establishes a framework of "policies and procedures to ensure that unaccompanied alien children in the United States are safely repatriated to their country of nationality or of last habitual residence." 8 U.S.C. § 1232(a)(1). As the statutory language suggests, the TVPRA does not guarantee that such children will be permitted to stay in the United States permanently. The TVPRA instead puts in place certain requirements for the processing of unaccompanied noncitizen children, including a requirement that such children are generally transferred to the custody of the U.S. Department of Health and Human Services' Office of Refugee Resettlement (ORR) while they await placement with a

suitable sponsor and immigration proceedings.  *See P.J.E.S. v. Wolf*, --- F. Supp. 3d ---, 2020 WL 6770508, at *1 (D.D.C. Nov. 18, 2020), *appeal pending*, No. 20-5357 (D.C. Cir. filed Nov. 30, 2020); *see also* 8 U.S.C. § 1232(a)(5)(D), (c)(2).[3]

ORR has explained that when unaccompanied noncitizen children initially enter ORR's custody, they are placed into quarantine and tested at least twice for COVID-19 prior to release from quarantine.[4]  Children who test positive for COVID-19 are kept in quarantine until they meet the criteria to discontinue isolation, and children with potential exposure to a COVID-19 case at any time are quarantined for seven days and will be released only upon the receipt of a negative test result after an observation period of at least five days.[5]

As of March 31, 2021, there were a total of 558 children in ORR custody in medical isolation due to a COVID-19 diagnosis; of these, 509 tested positive for COVID-

---

[3] Unaccompanied noncitizen children from countries that share borders with the United States (i.e., Mexico and Canada) may, unlike children from other countries, be permitted to withdraw their application for admission if they are not victims of trafficking (or likely trafficking victims), do not have a fear of returning to their home country, and are able to make an independent decision about withdrawing their application for admission.  8 U.S.C. § 1232(a)(2); *see P.J.E.S.*, 2020 WL 6770508, at *1.  Such children are screened prior to a determination of whether they are able to voluntarily return and, if they are not able to return voluntarily, are transferred to ORR custody.  8 U.S.C. § 1232(a)(2).

[4] *See* Notice of Filing Juvenile Coordinator Reports, *Flores v. Garland*, No. 2:85-CV-4544, Doc. 1104 at Page ID 42940 (C.D. Cal. Apr. 9, 2021).  In the *Flores* litigation, ORR has submitted periodic reports during the COVID-19 pandemic with information about, among other things, incidences of COVID-19 within ORR's custodial population and ORR's efforts to mitigate the risk of COVID-19.  These reports are a matter of public record and accessible on the docket of that case, and this Court may consider materials from outside the record in ruling on this jurisdictional motion to dismiss.  *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

[5] Notice of Filing Juvenile Coordinator Reports, *Flores*, No. 2:85-CV-4544, Doc. 1104 at Page ID 42940.

**Defendants' Motion to Dismiss – Page 5**

19 prior to placement in ORR facilities.[6]  To put these numbers in perspective, there were

a total of 12,313 children in ORR custody at that time,[7] meaning that roughly 4.5%

percent of the population[8] was COVID-19 positive, with the overwhelming majority of

these having tested positive prior to entry into an ORR facility.

**B.     Plaintiffs file this suit challenging the CDC's February 2021 notice and unsuccessfully seek a temporary restraining order.**

Plaintiffs are individuals residing in Potter County, Texas (Steven Pace) and Ellis

County, Texas (Todd Little and Brian Harrison).  (Doc. 8, ¶¶ 11–14.)  Plaintiff Pace

alleges that he travels to San Angelo, Abilene, and Pecos for work and that the CDC's

February 2021 notice increases his risk of contracting COVID-19.  (Doc. 8, ¶ 11.)

Plaintiff Little states that he is 51 years old and that "thousands of alien children are

being held in, and released into, areas of Texas, including in or near Ellis County," such

that he is allegedly at an "unduly increase[d]" risk of contracting COVID-19.  (Doc. 8,

¶ 12.)  Little also explains that he is the Ellis County Judge and is suing in his "individual

and representative capacities" (but not an official capacity); that as such he administers

the county's health and human services, including indigent health care services; and that

allowing unaccompanied noncitizen children into the country "risks unduly straining Ellis

County's healthcare system and limited hospital capacity."  (Doc. 8, ¶¶ 12, 13.)  Plaintiff

---

[6] *Id.*

[7] *Id.* at Page ID 42938–40 (tally of "Beds Occupied" figures in the census chart).  As noted in the ORR report, census figures for children in ORR custody represent a "snapshot in time as this information is constantly changing."  *Id.* at Page ID 42938 n.5.

[8] 558 out of 12,313 children.

Harrison, who also lives in Ellis County, likewise alleges that he is at risk of contracting

COVID-19 for essentially the same reason as Little.  (Doc. 8, ¶ 14.)

In their single-count first amended complaint, Plaintiffs request judicial review of

the CDC's February 2021 notice under the Administrative Procedure Act and assert that

the notice was arbitrary, capricious, and unlawful in excepting unaccompanied noncitizen

children from expulsion under the October 2020 order.  (Doc. 8, ¶¶ 85–89.)  Plaintiffs

also previously moved for a temporary restraining order to temporarily set aside the

February 2021 notice (Doc. 10), but the Court denied that motion in an order issued on

March 25, 2021 (Doc. 12).  Noting that the purpose of a temporary restraining order is to

prevent irreparable harm on an interim basis and that "[s]peculative injury is not enough"

to obtain such relief, the Court explained that Plaintiffs had failed to "detail any actual

examples of *non-speculative, future* harm that they could face over the *next fourteen days*

before a full hearing on a preliminary injunction."  (Doc. 12 at 5.)  Plaintiffs never did

request a preliminary injunction, though, and thus nothing further has occurred in the

case since their motion for a temporary restraining order was denied.  Defendants now

move to dismiss for lack of subject-matter jurisdiction.

### III.      Legal Standard

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a case is properly

dismissed when the court "lacks the statutory or constitutional power to adjudicate the

case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th

Cir. 1998) (citation omitted).  "The burden of proof for a Rule 12(b)(1) motion to dismiss

is on the party asserting jurisdiction."  *Ramming v. United States*, 281 F.3d 158, 161 (5th

Cir. 2001) (citation omitted).  "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist."  *Id.* (citation omitted).

## IV.    Argument and Authorities

This action should be dismissed for lack of jurisdiction for any of three independent reasons.  First, Plaintiffs lack standing because their alleged injury is at best speculative and is unsupported by any concrete factual allegations of actual, imminent harm causally connected to the CDC's February 2021 notice.  Second, the first amended complaint alleges no final agency action that would be subject to Administrative Procedure Act review.  And third, even if there were a final agency action, the CDC's decision to effectively suspend enforcement of the October 2020 order as to a relatively small group of persons (unaccompanied noncitizen children) is committed to agency discretion and thus is not reviewable under the Administrative Procedure Act.

## A.    Plaintiffs lack standing.

Standing is an essential component of federal-court jurisdiction under Article III of the Constitution.  To meet their burden to establish standing, Plaintiffs must establish three elements:  "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009).  Plaintiffs bear the burden "clearly to allege facts demonstrating" each of these three elements.  *Warth v. Seldin*, 422 U.S. 490, 518 (1975); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (confirming that a plaintiff has the burden "clearly to allege facts demonstrating that he is

a proper party to invoke judicial resolution of the dispute" (citation omitted)).

Here, though, Plaintiffs' bid to establish standing fails at the first two elements because Plaintiffs have not alleged facts showing any actual, concrete injury in fact, and they likewise fail to demonstrate any causal connection to the challenged government action.  As discussed below, Plaintiffs' claimed injuries instead depend on a speculative chain of events that is unmoored from any concrete factual allegations—and thus is insufficient to establish standing.

Plaintiffs primarily suggest that the CDC's February 2021 notice puts them at an increased risk of contracting COVID-19.  But other than simply asserting that this is so with an accompanying statement that "thousands of alien children are being held in, and released into, areas of Texas," (*e.g.*, Doc. 8, ¶¶ 11, 12, 14), there is no factual predicate provided for this conclusory claim.  Plaintiffs' speculative statements do not show that the February 2021 notice exposes Plaintiffs to an actual or imminent injury in fact.  To the contrary, for any Plaintiff to contract COVID-19 from a child subject to the CDC's February 2021 notice would require a series of speculative events first to occur, including that

- a child who otherwise would not have qualified for an exception to the October 2020 order but was excepted from expulsion under the February 2021 notice would need to

- enter ORR custody with COVID-19 or become infected while in ORR custody and then

- be released to a sponsor while COVID-19 positive and contagious (notwithstanding ORR's quarantine and testing procedures designed to prevent precisely that) and then

- travel to either Potter or Ellis County, or to some other location where a Plaintiff is temporarily present, and then

- behave in a way that exposes a Plaintiff to the virus, presumably through personal interaction, notwithstanding any other health precautions the Plaintiff might take.[9]

Notably, Plaintiffs provide no factual allegations about how or when unaccompanied noncitizen children excepted from expulsion under the February 2021 notice might travel from ORR facilities to Potter or Ellis County, or to any other location where a Plaintiff resides or is regularly present.  And even assuming some children will continue to enter ORR custody with COVID-19, Plaintiffs provide no facts showing that children would be COVID-19 contagious upon their release from ORR custody to a sponsor (who could be anywhere in the United States) or at the time of any future, speculative arrival in Potter or Ellis County.  Plaintiffs also do not allege any concrete facts suggesting that they would come into contact with any children at an ORR facility or otherwise at any time in the future, nor do they allege what personal precautions they are taking to protect themselves against COVID-19 (such as vaccinations or masking) and how such precautions would nonetheless be ineffective against any alleged risk of exposure from unaccompanied noncitizen children.

Additionally, Plaintiffs cannot ignore the fact that on March 2, 2021 (Texas

---

[9] There are undoubtedly other possible speculative scenarios under which a child in ORR custody might cause a Plaintiff to be exposed to COVID-19, such as if some other person contracted COVID-19 from an unaccompanied noncitizen child and then by chance that person interacted with a Plaintiff and passed the disease along.  But such occurrences are even more speculative and require additional inferential steps above and beyond those required in the direct-transmission scenario as described above, and thus such scenarios would be even less supporting of a concrete, causally-connected injury in fact.

**Defendants' Motion to Dismiss – Page 10**

Independence Day), Governor Greg Abbott announced that Texas is "OPEN 100%"[10] and by executive order removed essentially all COVID-19-related limits on businesses and other establishments within the state.[11]  More recently, on May 18, 2021, the governor issued a second executive order that bars essentially all government officials from requiring masks or face coverings.[12]  Plaintiffs may disagree with the governor's decisions—which decisions were made well after, and presumably with full awareness of, the CDC's February 2021 notice—or with the governor's explanation on May 18, 2021 that "COVID-19 hospitalizations and the rate of new COVID-19 cases have continued their steady decline."[13]  However, the fact that essentially all COVID-19-related restrictions have now been lifted in Texas is a further obstacle to Plaintiffs' ability to show that they are at some increased risk of COVID-19 *specifically by reason of the CDC's February 2021 notice* (as differentiated from whatever general risk still exists on account of all community-spread factors), as would be required to establish some claimed injury fairly traceable to the CDC's action.

Aside from Plaintiffs' generalized (and speculative) allegations about the risk of personally contracting COVID-19, Plaintiff Todd Little also alleges that he is the Ellis

---

[10] @GregAbbott_TX, https://twitter.com/GregAbbott_TX/status/1366846908480815106 (Mar. 2, 2021).

[11] 46 Tex. Reg. 1567 (Mar. 2, 2021).  This order does contain an exception for any "area with high hospitalizations" as defined in the order, but there currently are no such areas.

[12] Governor of the State of Tex., Executive Order No. GA-36 (May 18, 2021), *available at* https://gov.texas.gov/uploads/files/press/EO-GA-36_prohibition_on_mandating_face_coverings_response_to_COVID-19_disaster_IMAGE_05-18-2021.pdf.  This order contains limited exceptions for prison and jail facilities and other group living environments.

[13] *Id.* at 1.

County Judge and that the CDC's February 2021 notice "risks unduly straining Ellis County's healthcare system and limited hospital capacity." (Doc. 8, ¶ 13.) But even assuming that Little in his "individual and representative capacities" (Doc. 8, ¶ 12)—not his *official* capacity—were the proper party to assert such a claim on behalf of Ellis County, the county does not have standing to assert any alleged injuries of its residents, and would instead need to identify some concrete, non-speculative injury that the county itself has suffered. *See El Paso Cty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020); *see also Arpaio v. Obama*, 797 F.3d 11, 19–25 (D.C. Cir. 2015). No such injury is identified. The allegations about Ellis County are even more speculative than the claim that an individual Plaintiff might contract COVID-19 as a result of the February 2021 notice. There are no facts alleged indicating that any unaccompanied noncitizen children have traveled to or taken up residence specifically in Ellis County (or will do so imminently) and have required hospitalization due to COVID-19, such that the county's healthcare system has been overly taxed as a result. In fact, despite filing this suit more than a month after the February 2021 notice, there is no allegation that Ellis County has been required to treat even a single unaccompanied noncitizen child, much less that its healthcare system is being overwhelmed. (To the contrary, Governor Abbott announced on May 23, 2020 that Texas has just reported its lowest-ever seven-day COVID-19 positivity rate and is also at a "new 11-month low in hospitalizations."[14]) No facts supporting any inference of a concrete, actual injury to Ellis County are provided.

---

[14] @GregAbbott_TX, https://twitter.com/GregAbbott_TX/status/1396675281558151171 (May 23, 2021).

In short, given the speculative and hypothetical nature of their alleged injuries, Plaintiffs cannot establish standing.  No injury in fact is shown, and likewise there are no facts pleaded to demonstrate a causal connection with the February 2021 notice.[15] Indeed, given the potential community transmission of COVID-19 from all sources, Plaintiffs would at a minimum need to plead facts establishing that any alleged increase in COVID-19 cases is due to the presence of unaccompanied noncitizen children who were excepted from expulsion under the February 2021 notice, rather than from some other source such as the general public.  Plaintiffs have not met their burden on standing.

The caselaw cited by Plaintiffs to argue for standing when seeking a temporary restraining order earlier in the case actually highlights the absence of standing here. Plaintiffs relied on *Texas Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020), to argue that their injury is "the risk that a plaintiff will contract COVID-19," and that "where a government action increases [this] risk . . . , the plaintiff has standing to challenge the government action."  (Doc. 10-2 at 11.)  But in *Texas Democratic Party*, the existence of an injury in fact was not actually in dispute.  *See* 978 F.3d at 178.  And it is apparent why—the plaintiffs there were challenging an election law that effectively barred them from voting by any method other than in-person during the pandemic, which

---

[15] The third element of standing, redressability, is also necessarily absent—given the speculative and attenuated injuries alleged by Plaintiffs and the lack of any firm connection to the February 2021 notice, by definition any favorable ruling from this Court would not provide any actual relief to Plaintiff.  *Cf. United States v. Cole*, No. 1:09-CR-118, 2021 WL 1207556, at *5 (N.D. Ind. Mar. 31, 2021) (denying a prisoner's request for release during the COVID-19 pandemic, and explaining that due to "community spread" there was "no guarantee that releasing [the prisoner] to live in Fort Wayne, Indiana or any other community would diminish his risk of contracting COVID-19").

the plaintiffs claimed put them at increased risk of contracting COVID-19 by requiring them to come into contact with others in order to exercise their right to vote. *See id.* at 175–76. Here, in contrast, Plaintiffs do not—indeed, cannot—allege that the February 2021 notice requires them to come into close contact with any unaccompanied noncitizen children in order to exercise a fundamental right such as voting, or even to do anything. Plaintiffs instead state only that unaccompanied noncitizen children are "placed in close proximity to one another in overcrowded border patrol and migrant facilities," (Doc. 10-2 at 11), but there is no allegation that the February 2021 notice somehow requires Plaintiffs to bring *themselves* to these facilities, for any reason. In the absence of any such allegation, Plaintiffs cannot avail themselves of standing under this kind of theory.

Moreover, as the Court noted when denying a temporary restraining order, Plaintiffs have relied on "*unsubstantiated* statements" about the alleged risk of COVID-19 occasioned by unaccompanied noncitizen children, and they "never state how long it takes for unaccompanied children to migrate northward from the border," "[n]or do they allege that those same children who had COVID-19 at the border would still be contagious by the time they arrived in Potter or Ellis County." (Doc. 12 at 5.) Defendants recognize that the Court was addressing the issue of irreparable harm in the temporary-restraining-order context when making these statements, but it is respectfully submitted that these same logical flaws in Plaintiffs' case are relevant to the issue of standing and further illustrate why no causally-connected injury in fact can be shown.

* * * * *

As the Supreme Court has repeatedly emphasized, standing doctrine requires a

litigant to identify some injury that "affects him in a 'personal and individual way'" such that he has a "'direct stake in the outcome' of the case." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (citations omitted).  Here, though, Plaintiffs' interest in vacating the CDC's February 2021 notice could conceivably be claimed with equal force by all residents of the United States, given that unaccompanied noncitizen children are released to sponsors throughout the United States following appropriate testing, quarantine, and isolation.  While Plaintiffs may sincerely disagree with the CDC's temporary suspension on expelling unaccompanied noncitizen children encountered in the United States under the October 2020 order, this kind of "generalized grievance" in the form of a disagreement with government policy writ large is insufficient to confer standing.  *See id.* at 706.  Even assuming that some concrete, non-speculative threat of injury did exist as a result of the February 2021 notice, each Plaintiff is "seeking relief that no more directly and tangibly benefits him than it does the public at large," which "does not state an Article III case or controversy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74, 574 (1992).  Accordingly, standing is absent.

**B.     There is no final agency action to review.**

A second jurisdictional bar to Plaintiffs' suit is the lack of any final agency action. Under the Administrative Procedure Act, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  In such circumstances, where the plaintiff is not seeking money damages, the Administrative Procedure Act supplies a waiver of the government's sovereign immunity, allowing the

plaintiff to proceed in federal court to challenge the agency action.  *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999).  But the Administrative Procedure Act authorizes review only of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Thus, in this case where Plaintiffs do not identify any statute outside of the Administrative Procedure Act providing for judicial review of the February 2021 notice (i.e., some way that the notice is "made reviewable by statute"[16]), there can be jurisdiction for review under the Administrative Procedure Act only if the agency action at question is a "final" one.  *See Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) ("If there is no final agency action, a federal court lacks subject matter jurisdiction." (citation omitted)).

An agency action is considered final under the Administrative Procedure Act when two requirements are met.  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  "First, the action must mark the 'consummation' of the agency's decisionmaking process," such that the action is not "merely tentative or interlocutory."  *Id.* (citation omitted).  Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.* (citation omitted); *see also Texas v. Rettig*, 987 F.3d 518, 530 (5th Cir. 2021) (same); *Ponce-Osorio v. Johnson*, 824 F.3d 502, 505 (5th Cir. 2016) (same).  The Supreme Court has underscored that "[a]n agency action is not final if it is only . . . tentative," and that the "core question is whether the agency has completed its decisionmaking process."  *Franklin v. Massachusetts*, 505

---

[16] 42 U.S.C. § 265, for example, does not create a cause of action for judicial review.

U.S. 788, 797 (1992) (citation omitted). "Only if the '[agency] has rendered its last word on the matter' in question . . . is its action 'final' and thus reviewable." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) (citation omitted). If a step is an intermediate step in an administrative process, it "cannot be viewed as a 'consummation' of agency decisionmaking." *Qureshi*, 663 F.3d at 781 (citations omitted).

Plaintiffs address finality in their first amended complaint by asserting that the February 2021 notice "marks the consummation of the agency's decision making process to create an exception to the [October 2020] Order." (Doc. 8, ¶ 82.) But this reasoning is circular and essentially assumes what Plaintiffs have the burden to show, that a final agency action exists. Under Plaintiffs' reasoning, every intermediate step in an administrative process could be considered a final agency action by simply defining the relevant decisionmaking process as the process of making *that particular intermediate decision*. But that is not how finality is analyzed. *See Bouchard Transp. Co. v. Dep't of Homeland Sec.*, 384 F. Supp. 3d 775, 778 (S.D. Tex. 2019) (explaining that there was no final agency action where the plaintiff was attempting to challenge an administrative decision in a Coast Guard investigation of a marine explosion, and rejecting the plaintiff's argument that the existence of a final decision "concerning the scope of the investigation" satisfied the finality requirement). To analogize to the context of a civil lawsuit in which generally only final judgments are appealable, Plaintiffs could just as easily say that an interlocutory order denying a motion to dismiss should be considered "final" insofar as it represents the consummation of the court's decisionmaking process *on that motion*. *See Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 490 F. Supp. 3d 1048,

1059 (N.D. Tex. Sept. 28, 2020) ("Courts have analogized the requirement of 'final agency action' to the final judgment requirement of 28 U.S.C. § 1291, which generally prohibits appeal of an interlocutory order."), *appeal pending*, No. 20-11179 (5th Cir. filed Nov. 27, 2020).  But again, that is not how finality is analyzed and would essentially open the door to judicial review of any intermediate, non-final decision.

The February 2021 notice makes clear on its face that, far from representing the CDC's final decision, it is at most "tentative or interlocutory" and does not represent the consummation of any decisionmaking process.  *See Bennett*, 520 U.S. at 178.  The notice states that the CDC "has decided to exercise its discretion to temporarily except from expulsion unaccompanied noncitizen children encountered in the United States pending the outcome of its forthcoming public health reassessment of the [October 2020] Order." 86 Fed. Reg. at 9942.  It further explains that the President had signed an executive order "requiring a review of the [October 2020] Order to determine whether [that] Order should be terminated, rescinded, or modified," and that the CDC would be "reassessing the overall public health risk at the United States' borders and its [October 2020 order] based on the most current information regarding the COVID-19 pandemic as well as the situation at the Nation's borders."  *Id.*

Courts frequently look, at least in part, to "the agency's own characterization of [its] action" in determining whether agency action is final.  *Food & Water Watch v. EPA*, 5 F. Supp. 3d 62, 81 (D.D.C. 2013) (citation omitted).  But even aside from the fact that the CDC has expressly classified the February 2021 notice as a temporary measure pending completion of some additional decisionmaking process, it is clear that the notice

does not operate as a permanent, final decision in any sense. Thus, the first requirement

for finality under the Administrative Procedure Act is not satisfied. With respect to the

issue of whether unaccompanied noncitizen children will be subject to expulsion under

any section 265 order, the agency has not "rendered its last word on the matter."

*Whitman*, 531 U.S. at 479 (citation omitted).

Nor is the second requirement for finality satisfied. Plaintiffs identify no way in

which the February 2021 notice determines any legal rights or obligations, or otherwise

gives rise to legal consequences of the type that would support judicial review. The

notice does not guarantee any permanent or even temporary legal immigration status to

any unaccompanied noncitizen child covered by the order. Instead, such children remain

subject to immigration proceedings and possible removal from the country under the

existing sources of law that normally apply to them. *See P.J.E.S.*, 2020 WL 6770508, at

*1; *see also Rettig*, 987 F.3d at 529 (explaining that finality requires showing some

"new" rights, obligations, or legal consequences resulting from the agency action in

question). Under Fifth Circuit precedent, an administrative decision that merely has the

effect of "prolonging the administrative process" is not considered a final agency action.

*See Data Mktg.*, 490 F. Supp. 3d at 1058 (discussing *Am. Airlines, Inc. v. Herman*, 176

F.3d 283 (5th Cir. 1999)). And that is essentially what has occurred here—any

unaccompanied noncitizen child covered by the February 2021 notice remains subject to

the normal immigration process, including removal proceedings that may ultimately

result in his or her removal from the country. So no final determination of any legal

rights or obligations has occurred.

Plaintiffs cite litigation arising out of the termination of the Deferred Action for Childhood Arrivals (DACA) program to allege that the CDC's February 2021 notice constitutes an "affirmative program" and is thus susceptible to judicial review at this time.  (Doc. 8, ¶ 86 (citing *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020)).)  But Plaintiffs are incorrect and a comparison of the February 2021 notice with DACA shows why the February 2021 notice in fact does *not* constitute final agency action determinative of any legal rights or obligations within the meaning of the Administrative Procedure Act.

As explained by the Supreme Court, DACA required U.S. Citizenship and Immigration Services to "establish" a new process for identifying certain noncitizens who would be "grant[ed] deferred action" under DACA.  *Regents of Univ. of Cal.*, 140 S. Ct. at 1906.  This new process involved the issuance of "formal notices" to noncitizens and led to "adjudications" that, if in the noncitizen's favor, constituted an "affirmative act of approval" that allowed the noncitizen to access things like Social Security and Medicare benefits that they would not otherwise have received.  *Id.*

In contrast, the February 2021 notice does not purport to establish any new system of proceedings involving "adjudications" that would "stamp" unaccompanied noncitizen children with any "affirmative act of approval."  Instead, the February 2021 notice merely excepted certain unaccompanied noncitizen children from expulsion under the October 2020 order.  The result is that these children simply default into the existing framework of immigration laws and procedures—including proceedings that may ultimately result in removal to their home countries.  The February 2021 notice therefore

does not constitute any "affirmative program" involving a new form of adjudication and the conferral of otherwise-unavailable immigration benefits on noncitizens, as was the case with DACA.  It is not a final agency action and is not subject to review under the Administrative Procedure Act.

## C.   The decision to partially suspend enforcement of a section 265 order is committed to agency discretion.

Yet another reason that no jurisdiction exists for Plaintiffs' suit is that the February 2021 notice represents an exercise of decisionmaking that is committed to the agency's discretion as a matter of law.  *See Qorane v. Barr*, 919 F.3d 904, 911–12 (5th Cir. 2019) (where a decision is committed to agency discretion by law, "[the court] lack[s] jurisdiction to review that decision").  As noted previously, the Administrative Procedure Act authorizes certain suits against the government for non-monetary relief related to an agency's action.  *St. Tammany Parish ex rel. Davis v. FEMA*, 556 F.3d 307, 317 (5th Cir. 2009) (citing 5 U.S.C. § 702).  However, it does not extend to the review of actions committed to agency discretion by law.  *Id.* at 318 (citing 5 U.S.C. § 701(a)(2)).  As explained by the Supreme Court, judicial review is not available "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Determining whether a decision is committed to agency discretion and thus unreviewable under the Administrative Procedure Act "requires careful examination of the statute on which the claim of agency illegality is based."  *Webster v. Doe*, 486 U.S. 592, 600 (1988).  Here, the relevant statute is 42 U.S.C. § 265, which in its entirety reads

*Defendants' Motion to Dismiss – Page 21*

as follows:

> Whenever [the CDC Director] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [CDC Director], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265.

Several aspects of this statute and its accompanying regulation (discussed below) demonstrate that the CDC's decisions on whether or not to issue, suspend enforcement of, or even terminate a section 265 order are committed to the agency's discretion within the meaning of the Administrative Procedure Act.  First, the statute does not require the CDC to prohibit the entry of any persons or property at any time, even if the statutory predicates for such an order are satisfied.  Even if the CDC "determines" that there is a "serious danger of the introduction of [a] communicable disease into the United States" that is "increased by the introduction of persons or property" from another country, the CDC is not *required* to do anything.  Instead, under these circumstances the CDC "shall have the power to prohibit" the introduction of the relevant persons or property.  In other words, the statute confers discretion upon the CDC to act, but does not mandate that it do so—the statute does not say that upon occurrence of the triggering conditions the CDC "shall prohibit" introduction, but only that it "shall have the power to prohibit"

introduction.  And given the discretionary nature of any decision by the CDC to issue, or instead decline to issue, a section 265 order in the first place, the lesser power of temporarily not enforcing a section 265 order against a specified class of individuals is also necessarily a discretionary one.  This makes sense because the CDC's actions under section 265 necessarily involve scientific and technical knowledge and experience regarding communicable diseases generally, and the application of such knowledge and experience to the specific communicable disease that threatens the public health.  Such expert judgments, at least where they do not implicate the exercise of constitutionally protected rights, are beyond the purview of the Judiciary.  *Cf. S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect,'" and "[w]hen those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" (first quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905), and then quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974))).

Second, although the statute does set forth certain criteria that must be satisfied for the CDC to be empowered to issue a section 265 order, there is no comparable enumeration of standards that must be satisfied for the CDC to temporarily except a certain group of noncitizens from expulsion under that order pending further agency review of the scope of the order.  To have the power to issue an order "to prohibit" the entry of some persons or property, the CDC must first "determine[] that by reason of the

existence of any communicable disease in a foreign country there is serious danger of the

introduction of such disease into the United States," and also determine "that this danger

is so increased by the introduction of persons or property from such country that a

suspension of the right to introduce such persons and property is required in the interest

of the public health." 42 U.S.C. § 265. Yet the statute sets out no comparable

requirements that must be assessed when the agency decides to temporarily suspend its

enforcement of a section 265 order as to a specified class of individuals. There simply is

no "meaningful standard against which to judge the agency's exercise of discretion" in

this regard. *Chaney*, 470 U.S. at 830; *see also id.* at 831 ("This Court has recognized on

several occasions over many years that an agency's decision not to prosecute or enforce

. . . is a decision generally committed to an agency's absolute discretion. This

recognition of the existence of discretion is attributable in no small part to the general

unsuitability for judicial review of agency decisions to refuse enforcement." (citations

omitted)).

The same is true of section 265's implementing regulation, found at 42 C.F.R.

§ 71.40. Section 71.40 specifies that the CDC "may" prohibit the introduction of

specified persons into the United States if certain criteria are satisfied, which criteria

track the statutory standards requiring that the danger of a communicable disease be

increased by the persons' introduction into the United States. *See* 42 C.F.R. § 71.40(a).

But like the statute, the regulation says nothing about what standards, if any, must be met

in order for the CDC to suspend the expulsion of a certain group of individuals under a

section 265 order while the CDC undergoes a review of the scope of that order. Again,

then, there are no meaningful standards supplied by the regulation to serve as the basis for judicial review of the February 2021 notice.

The Fifth Circuit has explained that a matter is committed to agency discretion, such that review under the Administrative Procedure Act is not available, if the relevant statutory or regulatory provision "[does] not require the consideration of specific factors, the making of findings or the development of any additional evidentiary record." *Ellison v. Connor*, 153 F.3d 247, 253 (5th Cir. 1998) (citing *Suntex Dairy v. Block*, 666 F.2d 158, 164–65 (5th Cir. 1982)).  "[W]ithout these, the judiciary [is] in no position to gainsay the [agency's] determination as arbitrary, capricious or an abuse of discretion." *Id.* (citing *Suntex Dairy*, 666 F.2d at 166).

As in *Ellison*, the applicable statutory and regulatory language of this case "does not contain standards or evidentiary requirements" for the relevant agency decision, i.e., the decision not to enforce a section 265 order to expel a specific group of individuals. No review under the Administrative Procedure Act is available.  *See also Promiseland Metro, Inc. v. U.S. Army Corps of Eng'rs*, No. 4:15-CV-817-A, 2016 WL 543209, at *3 & n.4 (N.D. Tex. Feb. 9, 2016) (same, where "plaintiffs have not cited any statute or regulation setting forth procedural requirements or specific substantive factors the [agency] was required to take into account" when making its decision).

## V.     Conclusion

This action should be dismissed for lack of jurisdiction.

Respectfully submitted,

PRERAK SHAH
Acting United States Attorney

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

<u>Certificate of Service</u>

On May 24, 2021, I electronically submitted the foregoing document with the

clerk of court for the U.S. District Court, Northern District of Texas, using the electronic

case filing system of the court.  I hereby certify that I have served all parties

electronically or by another manner authorized by Federal Rule of Civil Procedure

5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney